Filed 5/18/26  In re T.P. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re T.P. et al., Persons Coming Under the Juvenile Court Law. | B347386 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.M., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 23CCJP01612 |

APPEAL from an order of the Superior Court of Los Angeles County, Lucia J. Murillo, Juvenile Court Referee. Conditionally reversed with directions.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, and Giselle Marie Achecar for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Mother D.M. raises two issues on appeal. First, she contends the juvenile court erred in terminating parental rights to two of her three children because the court should have invoked the beneficial parental relationship exception to termination to keep her family together. We conclude substantial evidence supports terminating Mother's parental rights and the juvenile court did not abuse its discretion in doing so.

Mother's second issue is that the juvenile court erred when it found no reason to believe the children had Indian heritage. The Los Angeles Department of Children and Family Services (DCFS) concedes this issue. We agree with the parties and conditionally reverse and remand the matter to the juvenile court to complete the inquiry into the children's possible Cherokee heritage.

## BACKGROUND

Mother has three children: son T.P., born 2015; daughter L.P., born 2016; and son N.P., born 2018. Father is deceased.

On May 10, 2023, Mother was placed on a Welfare and Institutions Code[1] section 5150 hold after she came to the children's school, asking for law enforcement to be called. The principal described Mother as frantic. Mother told a responding police officer she was "[o]n the run for her life" from Chicago because a hitman was after her and she was now homeless. (Italics omitted.) The responding police officer described Mother as "very paranoid, anxious and all over the place and had to be

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

redirected." The shelter where Mother and the children had been living confirmed it had asked Mother to leave because she was delusional, having altercations with staff and residents, accusing staff of tampering with her food, and putting soap in the children's milk to see who would drink the milk. The children were in tears.

DCFS was contacted because no one could provide for the children. The children themselves appeared well-cared for, well-fed, clean, well-dressed and healthy, according to school officials. L.P. reported they ate well, had clean clothes to wear every day and bathed daily.

DCFS interviewed mother at the hospital. She said she had an argument at the shelter where she lived with the children. She said a resident with whom she argued was also from Chicago and knew all of Mother's personal information. Mother acknowledged putting soap in the milk because she wanted to stop others who were stealing her food. Mother said the children did not drink the milk; she had to throw away their food which is why the children had not eaten. She told the shelter's manger she was being "framed and followed." Mother noted that others had tried to kill her before and she accused her deceased husband's family of trying to get her. She believed she was on a 5150 hold because she had been crying at the children's school.

On May 12, 2023, DCFS filed a petition alleging the children were at substantial risk of serious physical harm because Mother's mental and emotional problems, which included paranoia, delusions, anxiety, and aggression, rendered her incapable of providing regular care and appropriate supervision of the children.

On May 15, 2023, the juvenile court detained the minors from Mother's custody and ordered monitored visitation for Mother two times per week for two hours each visit. The court designated the three children a sibling set.

The children were placed in a foster home with caregivers Mr. and Ms. S. The children remained together in that placement through termination of Mother's parental rights two years later in June 2025. The juvenile court eventually designated the caregivers as prospective adoptive parents for all three children.

Between the filing of the petition and the September 6, 2023, adjudication hearing, Mother told DCFS she previously lived in Chicago but moved to California in January 2023 because of fear for her safety and that of her children. She and the children had lived in shelters since arriving in California. She worried about regaining custody of her children because of her mental health problems and because she feared the children would start to resent her. In July 2023 Mother denied being paranoid and delusional and stated she never harmed her children. She insisted a woman at the shelter had been tampering with her food and the staff did nothing when she reported it. She said after the woman was removed from the shelter, a new resident started eating her food. Mother said she knew the names of the people and the organization that were trying to harm her family. Mother confirmed the children's deceased father committed domestic violence and sexual assault against her.

In preparation for the adjudication hearing, DCFS advised the court that Mother had to be redirected not to speak to the children about the case or about returning home. Otherwise, she

4

regularly visited the children, matched their energy, and redirected their behaviors appropriately. She complied with her medication and followed through with her mental health treatment. She had "excellent visitation" with her children and nurtured and redirected them when appropriate.

At the adjudication hearing on September 6, 2023, Mother pled no contest to the petition as interlineated by the court. The court found that Mother's mental and emotional problems included posttraumatic stress disorder which limited her ability to provide regular care and appropriate supervision for the children. The court found by clear and convincing evidence there was a substantial danger to the children's physical and emotional well-being if they were not removed from Mother's custody and control. The court maintained the same monitored visitation order for Mother and ordered a case plan which included parenting classes, individual counseling and compliance with prescribed medication management.

Between the adjudication hearing on September 6, 2023, and the permanency and planning hearing on June 6, 2025, the children reported feeling happy and safe together at the home of Mr. and Ms. S. The children also individually reported they wanted the monitor present during their visits with Mother.

During that 21-month period, Mother made little progress in handling her mental health issues appropriately so she could be a parent to her children. The general consensus among her service providers was that Mother was unpredictably violent, caustic towards her children, then loving and sometimes compliant. Mother resided at a home for single mothers but continued to disrupt staff and other residents by her erratic behavior. The director reported that " 'we cannot work with her.

She does not follow the rules nor does she think she needs to meet with her life coach weekly, which is part of the program. Mother continues to demonstrate odd behavior that is alarming as one minute she is cool, calm and collect[ed], and the next you don't know what is going on because you are getting yelled at and blamed for mothers own efforts. . . . We have told her a number of times that her only responsibility is to find a job and housing, and that in doing so she is to keep track of her efforts so that we can assist if need be and or verify that [M]other is doing what is expected of her. [¶] Things with [Mother] have gotten so bad that we even took the job searching off her list of things to work on so she can secure housing.' " The director of the program did not want Mother to visit with the children at the home because she feared Mother was "going to just take off with the children." Mother enrolled in treatment programs but was removed due to her aggressive behavior towards class facilitators or other participants. She delayed participating in a psychiatric assessment.

DCFS reported Mother's behavior raised concerns about the children's safety if they were left unattended in her care. She visited N.P. at the school fence where she spoke to him privately. She would try to fit all three children into one bathroom during monitored visits so she could speak to them privately, despite being informed not to do so. She spoke about case-related issues in front of the children despite being redirected not to do so. The children's therapist thought Mother was trying to undermine the foster parents. Mother's therapist, who saw her only virtually, expressed concern about Mother's stability and her ability to be consistent in her parenting behaviors.

Things soon began to go downhill for reunification after the adjudication hearing. Not three months into the reunification period, on December 1, 2023, Ms. S. (the children's foster parent) called DCFS to report that Mother showed up at the children's school and was seen talking to N.P. through the fence. Mother had been told she was not allowed to be at the school, but she continued to go. Mother became upset when DCFS asked her not to go to the school. She denied she was doing anything other than walking on a public sidewalk.

Also in December Ms. S. reported the children came home from visits upset, stating Mother did not have any money. The children also told her they did not have to listen to their foster parents.

Ms. S. reported she was concerned about the children's attitude after they returned from visiting their mother. Ms. S. reported that the youngest, N.P., came home upset from a visit, said he hated Ms. S., and did not make his usual request for a hug. L.P. then started to tell Ms. S. why N.P. was upset and T.P. hit L.P. to stop her from talking. L.P. also told Ms. S. Mother said Ms. S. is the one preventing them from returning to her. Mother kept asking the children if Ms. S. was mean and wanted to know if Ms. S. was hitting them.

On January 15, 2024, Ms. S. stated the children seemed to know too much about the court case; after one visit, T.P. reported he would be returned to Mother at the upcoming March court date.

On January 17, 2024, Mother's treatment provider disclosed that Mother was terminated from her program. Mother had "been extremely disruptive in class and at times had challenges with properly managing her emotions that resulted in

7

confrontations with facilitators and other program participants." Another provider noted: " 'I have a lot of concerns with Mother and her uncertainties with her behavior. Mother goes from 0-100 with staff and others in the home and what happened if the children do not do what [they're] told is she going to display that same behavior with them.' "

That same month the social worker monitoring visitation reported mother was "spiraling"—she did not remember certain things and would resend things she previously communicated. The monitor reported Mother again tried to get all three children together into the bathroom and was upset when told not to do so. The monitor observed Mother "is not always present in the moment during visits. Sometimes you have to redirect her and she continues to talk about the case despite being redirected. It is almost like you have different personalities where she can't remember what was just said and done then she goes back to being happy and like nothing bothers her."

On January 29, 2024, Mother's life coach, Jayda, reported: " 'I have a lot of concerns with [M]other and her behavior. One minute she is fine and the next she is not. I do not think she should be around her children, if one gets a bad grade she might flip. Mother does not follow rules, causes issues daily with staff and other residents, [and has] aggressive, random behaviors and mood swings, not caring, only aggressive, and not stable. One minute she will be calm and collect[ed] then the next she is aggressive out of nowhere and nobody will even had to say or do anything to initiate her behavior. One minute she is acting polite and professional and then the next she is completely different. We have not made any progress with her.' "

In February 2024, Mother was still speaking about the case in front of the children. Mother questioned why she needed a mental health assessment, stating the children had been removed from her because she did not have housing.

On February 26, 2024, DCFS received a call from the director of Mother's program to report that Mother was being terminated from the program. The director stated that after Mother "received her court report [for an upcoming hearing,] she was upset and aggressive towards staff and other house mates. . . . Mother wouldn't stop yelling and she was screaming telling us that we were the reason she doesn't have her children and all of this took place in front of other children in the home." Mother was non-compliant with house rules and went from being calm to screaming and yelling, which caused other tenants to not feel safe. The director sent Mother an email informing her that her contract was terminated effective March 7, 2024 because of concerns about her attitude, performance, and non-compliance with program requirements. The letter documented two incidents where mother's aggression raised safety concerns for staff.

In light of Mother's continued aggressive and unpredictable behavior, DCFS recommended she undergo an evaluation to determine the potential future safety risks she might pose to the safety of the children. In April 2024, one of Mother's facilitators reported Mother had recently started to yell and scream at her.

By June 2024, Mother was living in a new shelter. Mother's psychiatrist had diagnosed her with bipolar disorder. Her treatment team advised the court Mother was compliant with all appointments and medication and was engaged in psychiatric services. Yet she continued to speak to the children

about the case and case-related issues during her visits with them.

In July 2024, the social worker arrived with the children at the park for visitation and Mother instantly started to speak about court matters in front of them. The social worker asked her to stop talking about court issues in front of them. Mother then did not engage with the children, which made them uncomfortable. Mother told the children, "DCFS is your parents." During a virtual visit later that month, Mother told the children how a stalker brought her flowers and ice cream at work, she did not like the man, and now she was scared because he set fire to a gas station. The caregiver reported the children were worried and scared for her life.

In June 2024, DCFS advised the court that the children reported feeling loved and safe with Ms. S. Mother was still speaking about case issues with the children despite being told not to. The children displayed negative behavior at their placement after the visits. Minors' counsel told the court the children all wanted to return to their mother's care and custody.

Adopting the recommendations of DCFS, on July 16, 2024, the juvenile court ordered continued family reunification services and maintained all prior orders.

Nine days later, on July 25, 2024, Ms. S. voiced her concern that the children are reporting "mother is saying bad words and they were scared of mom when she was yelling and saying mean things." In August 2024, Mother called the social worker screaming that she wanted more hours of visitation. She complained that DCFS criticized her discipline of T.P.: " 'How did [T.P.] feel when I was discipline them? They were fine[.] I'm allowed to talk to them as I want[.] I am not physically hitting

them[.] I'm telling [T.P.] that he isn't a man and that he can't do what he did. I am his mother I am allowed to talk to him in a stern voice and if he wants to cry that is his fault because he is messed up. They ain't scared.' " That month Mother enrolled in a new parenting class but completed only two of 12 classes.

During an August 2024 video call with the children, which Mother took at her place of employment, Mother engaged in a verbal argument with an unknown woman on her end of the video in front of the children. The social worker intervened. Mother became upset and the children sat with shocked looks on their faces. N.P. did not engage during the entire video. In another August 2024 visit, Mother told the children she was going to change their names. The monitor later reported Mother would say things under her breath that he could not catch but the children could hear.

In September 2024, Mother was unable to discuss with the social worker the topics covered in the parenting class and Mother questioned why she needed to attend. She stated, " 'I don't know why I am doing the parenting class if mental health is the concern you have. I am taking the medication and I'm reporting I'm okay my progress letter states I am fine so I don't know why you guys are concerned.' " In September 2024, Mother reported she was taking her medication as prescribed. She had earlier refused a plan to take her medication by injection, stating the plan had since been cancelled, an untrue statement. She continued to speak to the children about the case, also blaming them for her behavior, which caused a shift in their emotional state. The monitor reported the children commented to him about Mother's behavior.

In October 2024, Mother was evaluated for bipolar disorder and schizophrenia. The social worker did not believe Mother was taking her medication as prescribed as she became dysregulated when under stress. The providers were recommending injectable medication.

That same month, DCFS reported that in August, the visitation monitor noted a lack of emotional connection between Mother and the children. Mother was often just spending money on the children but not engaging and spending quality time with them. The caregivers reported the children's behavior "degraded" after their visits with mother. Specifically Mother continued to visit regularly, but she spoke with the children about the case and "inappropriate issues" and was frequently dysregulated in her own behavior. When redirected, Mother became closed off, disengaged with the children, and turned to her cell phone. Mother minimized her mental health issues and blamed DCFS for the children's removal. She told her virtual therapist that she was "doing enough" and did not need medication. She declined to take medication by injection as recommended by her doctor. She used profanity in front of the children, which prompted them to cover their eyes and ears. She also discussed with the children getting them passports as well as changing their names. DCFS was concerned that she might flee with the children if they were left unattended with her.

During an October 2024 visit, Mother completely disengaged from the children during the last 30 minutes of the visit, walking away without saying goodbye to them. The children just stared at her as she made her way across the park without them. Another October 2024 visit ended early due to Mother's "gaslighting" behavior. During an October 28, 2024

12

visit, Mother, using an aggressive and forceful tone, asked N.P. why he had not spoken to her during a recent virtual visit. The children had been happy to see the monitor when the visit started, but the moment Mother arrived, the children's demeanor shifted and they became uncomfortable talking to the monitor.

In October 2024, DCFS recommended terminating family reunification services and proceeding with a permanent plan of adoption. DCFS wrote: "During this period of supervision, [M]other has made minimal efforts in maintaining productive and healthy visits." "[M]other has not been able to meet her case plan's service objectives. Mother has not been able to establish appropriate boundaries with herself and the children, fails to show an understanding of the children's emotional needs, [has been] unable to demonstrate appropriate parenting skills, and has not stabilized her mental health."

At a hearing on November 12, 2024, the juvenile court ordered Mother not to discuss the case with the children during future visitation, which continued to be monitored.

An 18-month review hearing was set for January 14, 2025. The juvenile court received into evidence DCFS reports and took testimony in chambers from T.P. and L.P. T.P. testified he felt safe with Mother; became upset when his brother N.P. refused to talk to Mother; and relayed messages from Mother to N.P. A few months earlier, Mother had told him he was not a man. T.P. was unsure he would still want to return to Mother if his siblings remained in foster care.

L.P. stated she would not feel as safe at her visits with Mother if the social worker or other adults were not present; in her opinion Mother was not ready to care for her in the way she needed. Both L.P. and T.P. stated they wanted to return home to

13

Mother. N.P. stated he did not want to return to Mother's custody.

Mother testified she had been in therapy about a year; she had been diagnosed with PTSD, anxiety, depression and bipolar disorder; she had learned a multitude of coping skills and a lot of parenting skills; she was taking Abilify by injection and felt calmer, coherent and clear; she had an apartment and a job working as a cashier at a gas station; she and the children felt uncomfortable visiting in the presence of the monitor because he has threatened to cancel their visits several times if they were too loud during the visits. Mother denied coaching the children.

DCFS argued that after 18 months of services, Mother was still "unable to regulate" and had not made significant and consistent progress. DCFS characterized the case as one where Mother "has repeatedly struggled to follow recommendations by her service providers, had difficulty signing releases of information for the department to discuss the case-related issues with her service providers and ultimately has really spent a lot of time focusing on the wrong issues in the beginning of the case and not really taking accountability for her behavior."

The juvenile court terminated family reunification services and scheduled a section 366.36 hearing for May 2025 to select and implement a permanent plan for the children. The court stated: "And the evidence points toward a number of concerning facts for the court. I think they're mostly summed up in a statement by [licensed] psychiatric social worker, Mr. Astrachan, at the bottom of page 20 opining regarding the state of mother's mental health, that he does not think that mother thinks that she's mentally ill. That doctors are still working to diagnose—to evaluate mother to diagnose her particular illnesses; and he

14

believed bipolar and schizophrenia were likely. [¶] He said that every time we talk, she is fine and considerate but there's something wrong with the client that we're unable to figure out, that one doctor is leaning towards bipolar, few thought schizophrenia. This statement's made in early October. That was prior to the time that mother began the Abilify injections that had been recommended for some time prior to that. [¶] But one thing that stands out to the court today in the testimony is that there was precious little testimony regarding mother's mental health. She testified to what she believed she'd been diagnosed with and there was some testimony on the treatment for that, specifically the medications that had been prescribed and less . . . evidence as far as the steps that she had taken had nothing to do with parenting classes than treatment of the symptoms of an underlying issue raised by the mental illness that go to, in large part, the communications between her and the children that were the subject of the monitors stepping in on multiple occasions and mother becoming dysregulated as a result of that. [¶] And ultimately that causes the court serious concern for mother's credibility, whether it's her perception of what is being observed or that she is simply misstating facts as they are alleged by the social workers, the monitors in this case, of her conduct at hearings—or at the visits that led to the department not liberalizing her visits with the children over a significant period of time, 18 months. [¶] And I think the children, to their credit, testified as might be expected, confirming a number of statements made in the reports, statements that they had previously made to the caregivers or social workers but walking some of those back. And I don't know that any of those is dispositive, but it does paint a broader picture of the continued

15

risk of returning the children to their mother. [¶] The mother was ordered to participate in programs and services as set forth in the case plan, and I find that she is currently in substantial compliance. [¶] I do find by clear and convincing evidence that DCFS did comply with the case plan by making reasonable efforts to return the children to a safe home and to complete steps that are necessary to finalize the children's permanent placement. [¶] The court finds by a preponderance of the evidence that return of the children to the physical custody of their mother would create a substantial risk of detriment to their— to the children, creating a continued necessity for and appropriateness of the current placement. [¶] Reunification services are terminated for mother because she does not meet the requirements under section 366.22[, subdivision] (b) to permit the court to continue reunification services." The court set a permanency planning hearing for May 29, 2025.

The next day Ms. S. reported Mother was seen after the hearing at the courthouse screaming and hitting the elevator door. Mother gave the caregiver an "evil" look and then ran to the children, telling them the court had taken them away from her. T.P. became emotional, L.P. ignored Mother and resumed looking at her tablet, and N.P. grabbed onto the caregiver for protection.

In March 2025 Ms. S. reported T.P. and N.P. fought after every visit with Mother. During the March 5, 2025 visit, Mother appeared disengaged and possibly under the influence as the monitor observed her eyes to be barely open and continuously blinking. She smiled at times that did not align with the conversation. At another March visit, Mother repeatedly encouraged T.P. to push another boy off the play structure after

16

the boy pushed T.P. The monitor had to intervene, complimenting T.P. for not pushing back and urging him to tell an adult if it happened again. That month, Mother gave T.P. her telephone number and told him to call her. T.P. denied having the phone number, although the caregiver later found it. T.P.'s behavior and lying had worsened, according to the caregiver. L.P. simply stated Mother was "tripping" at a recent visit.

By April 2025, Ms. S. reported the children generally struggled to deescalate after visits with Mother. Their behaviors seemed to be directly influenced by Mother's mood during their time together. DCFS suspected Mother used bathroom breaks to communicate privately with the children as "evidenced" by the children's questions when they returned to their placement. The children's therapist noted a regression in the children's willingness to discuss their feelings after visits with Mother. DCFS advised the court that Mother "failed to demonstrate an understanding of how her mental health and her subsequent behaviors negatively affect the children." Ms. S. reported Mother continued to tell the children they would be going home with her at the next hearing, causing behavioral issues.

At a visit in May 2025, Mother had the children write down her name, telling them it was so they could find her when they were older. During a visit on May 24, 2024, Mother watched without comment as the children acted out in a restaurant by banging utensils and kicking each other. When N.P. fell and hurt his knee at the park, Mother did not comfort him; she told him to stop crying. On the way back from the visit, the social worker twice asked the children how they liked the visit. They remained silent and looked at one another.

The permanency planning hearing began on May 29, 2025. The children's testimony revealed their distressing positions "between a rock and a hard place," as the saying goes.

A.  **T.P.**

T.P. was eight years old when the case was filed. After the initial incident at his school on May 10, 2023, he said his mother had been crying because his father's family was out to get them. Mother had told him his father had left him a lot of money and the paternal family was now out to get it. T.P. told DCFS that when the family lived in Chicago, they lived hotel to hotel and his father's family was after them. T.P. said he witnessed domestic violence between his parents. T.P. said Mother would get angry and often get scared. He denied being afraid of Mother. He said he was scared for his life because Mother was scared.

Before the adjudication hearing in September 2023, T.P. told DCFS he became sad, lonely and worried when separated from Mother. He said he found it hard to adjust to his foster home but reported he had fun and participated in several activities there. Mother reported T.P. would become tearful about leaving her side after scheduled visits. She also reported T.P would try to protect her when there was domestic violence in their former home. He was observed to be overprotective of his brother and sister and jealous when others played with his siblings. He was sure there were "bad people in Chicago trying to hurt his mom."

In November 2023, T.P. reported he enjoyed meeting with his therapist and he would like to see the caregivers and go to church with them even if he returned to his mother's custody. He was observed to be more outgoing and comfortable with stating how he felt. T.P.'s therapist believed T.P. was parentified and

18

hesitant.  During a video call in April 2024, Ms. S. overheard N.P. asking Mother about passports and the plan to leave.  T.P. then hit N.P.

In July 2024, T.P. reported it was hard to tell Mother "no." He noted Mother got upset and then he was afraid to tell her things.  He was also worried that he would not go back to her and the family would not be together again.  T.P. stated he was the most comfortable at visits with his Mother when the monitor was present.  He appeared well bonded with the S.'s and continued to report feeling safe and loved by his caregivers.  T.P.'s therapist indicated he was working with T.P. to make him recognize he needed to be a child and it was not his responsibility to be a father to his siblings.  The therapist opined Mother had such a psychological hold over T.P. that he felt he had to do everything to get his siblings to behave in the way he thought Mother wanted them to behave.  T.P. had not been able to get N.P. and L.P. in line and Mother was now telling him he was not a man. The therapist was concerned about how this was affecting T.P. emotionally.

By October 2024, T.P.'s therapist opined he had become a different child, becoming more reserved and cold.  T.P. had taken on the role of Mother's protector and had a shift in his demeanor after it was reported Mother told him he is not a man.  The therapist believed T.P. felt like he had failed Mother as he had been unable to control his siblings' engagement with her. Conjoint therapy was out of the question because the therapist believed T.P. would feel unable and uncomfortable expressing himself to Mother and Mother would control the conversation. T.P.'s therapist noted the "continuous spiral pattern of behavior" by the children that followed Mother's visits.  T.P. said he liked to

have the monitor present during video calls and visits with Mother. As much as he liked seeing and visiting Mother, he did not like it when Mother yelled and did not listen to the monitor.

In December 2024, the caregiver reported T.P. was mean towards his siblings, punching L.P. in the stomach. They had argued earlier that day about returning to Mother.

In April 2025, DCFS reported T.P. was "strongly bonded" with Mother, but he is not comfortable with unmonitored contact during visitation. T.P. defended everything Mother did. He sometimes told Mother to compose herself during visits to prevent a visit from being canceled. T.P.'s relationship with Mother had adversely affected his academic performance as he had difficulty staying focused in class and needed assistance completing assignments.

That same month, the caregiver reported that it had been a difficult weekend due to T.P.'s acting out. During a recent visit, the monitor had gone to the restroom, and Mother told the children they had to fight for her in court or they would be adopted. The caregiver reported that T.P. said " 'I just want to be a kid, and I have too much stuff on my shoulders and that mom wants me to lie for her and I can't do it.' " The caregiver reported T.P. stated he was disappointed in Mother and felt guilty both if he told the truth and if he lied to her.

T.P. confirmed to the social worker that Mother told the children to fight for her because she did not want them to be adopted. T.P. said he felt he was in a tug of war between Mother and Ms. S. and he felt like he had to lie because of Mother but he was sad doing so because of Ms. S. T.P. said he wanted to go home with Mother or at least have overnight visitation with her.

Against this backdrop T.P. testified on May 29, 2025 at the permanency planning hearing. He stated he did not want to be adopted if it meant he would not be able to see Mother anymore. He thought "of happiness" when he thought of Mother. She was one of the people he felt closest to and he did not want to lose another parent after losing his father. T.P. testified Mother told him "You have to fight for me" which meant trying to stay with her, trying to get back. He felt both mother and Ms. S. wanted him to say what they wanted to hear. T.P. acknowledged he would be alright staying with Mr. and Ms. S. as long as he could still talk to Mother. He did not want to be adopted if it meant he could not see Mother.

B. **L.P.**

L.P. is Mother's seven-year-old daughter. After the initial May 10 incident at school, L.P. said people at the shelter were messing with the family's food. She acknowledged Mother put soap in their milk to stop other people from drinking it. She shared Mother had been crying and said unspecified people wanted to kill them and take the children away.

L.P. reported that when she was separated from Mother's care, she became sad, lonely and worried. She had trouble initially adjusting to the placement, but stated she enjoys living there because they have fun and participate in several activities. She reported feeling safe at the foster home. She was happy when visiting with Mother because they did fun activities. She stated, however, she wanted the monitor to stay with them at the visits.

In July 2023, L.P. stated she had witnessed her father dragging her mother by the hair to the bathtub.

21

In November 2023, L.P. was described as "always happy and friendly." "[S]he is pretty quiet but she is usually always happy unless her brothers start to annoy her. [She] is very honest and loves to dress up and dance." L.P. reported that she wanted to continue to go to church on Sundays and her social worker observed she was well bonded with her caregivers and is comfortable telling them her needs or wants. She excelled in mental health services. L.P. reported she feels happy when she is at visits with Mother, but she still wanted a monitor to be with them at visits.

By July 2024, L.P. was still reporting she liked the fun things she does with Mother during visits, but it was hard to tell Mother how she felt because she was worried Mother would "get mad" at her. At one visit Mother made the children take a nap. L.P. did not want to do that, but she did not want to tell Mother because she did not want to upset her. L.P. said she liked the visitation monitor because the monitor watches them. DCFS noted L.P. tended to "get quiet and closed off when discussing mother." L.P. also told Ms. S. that Mother was " 'ruining our lives.' "

At a visit in September 2024, L.P. tried to hug Mother, who pushed L.P. away.

By November 2024, L.P. had reported she did not like it when Mother yelled, did not listen to the social worker, and pushed L.P. away when L.P. tried to hug her. She did not like it when Mother whispered things in her ear because what Mother said saddened and upset her. DCFS reported L.P., "became closed off" when asked about the things Mother said to her. L.P. liked that visitation was monitored. She remained consistent

that she wanted to have contact with her mother but felt most safe and happy when monitors were present.

Against this backdrop, L.P. testified at the permanency planning hearing.  She stated she liked visiting with Mother and also felt "good" about the caregivers.  She did not want to be adopted by Ms. S. but wanted to stay with them until Mother could get her back.  She felt safe when alone with Mother and felt Mother was not ready for her to go home now.  L.P. testified she still sometimes felt most safe when there was a monitor present at her visits with Mother.  She loved the S.'s and Mother.  Mother told L.P. to fight for her, but L.P. said she did not know what Mother meant by that.[2]

Mother also testified at the permanency planning hearing. The children were now seven, nine and ten years old.  She had regular visits with them where they played games, talked about school, and read books.  She felt the children were happy and loving during the visits and never expressed discomfort at seeing her.

Counsel for T.P. and L.P. argued that the juvenile court should apply the beneficial parental relationship exception to termination of parental rights.

On June 6, 2025, the juvenile court made extensive findings about the two years Mother and the children had been before the court.  The juvenile court declined to apply the beneficial parental relationship exception, terminated Mother's parental rights, and ordered adoption as the permanent plan for all three children.  In doing so, the court concluded: "The court

---

[2]     Mother has not challenged the termination order as to N.P. so we do not recite his testimony at the hearing.

reviewed the evidence and considered the testimony of everyone, and the 2021 case *In re Caden C.* as set forth in the minute order. [¶] . . . In order to meet *the Caden C.* standard, [Mother] is required to prove by preponderance of evidence that she maintains regular, consistent contact with the children, taking into account the extent of visitation permitted that the children have a substantial, positive, emotional attachment to her and that terminating the attachment would be detrimental to the children when balanced against the countervailing benefit of a new adoptive home. [¶] . . . [Mother] has maintained regular and consistent contact with the children. . . . [¶] The children have resided in their current placement since they were removed from [Mother] in May 2023. In order to make a determination regarding whether there's a substantial, positive, emotional attachment, the court has considered the reports for the relevant information regard[ing] the children's relationship with [Mother]. [¶] When the children were taken into custody by D.C.F.S., the children described having to move around a lot while in mother's care. They described mother's paranoid, delusional behavior they thought people were out to kill them, which is why they had to move around so much, which is why they left Chicago and ended up in California. They obviously love their mother when they were removed from the department, she was their only caregiver when they were detained. [¶] When the court examined the evidence in the [six month status review] report dated March 6, 2024, the children had been in case for ten months. [¶] The report notes [T.P] has gone from being closed off and reserved to more outgoing and comfortable with stating how he's feeling. [T.P.] has been [seen] during in-person monthly visits as well bond[ed] with the caregivers and stated he enjoys being there and stated

24

even though he goes back to mom, he still wants to see Ms. [S.] and go to church with them. [¶] . . . [¶] [L.P.] reports how happy she was with Ms. [S.] and likes going to church on Sunday. [¶] 'I really like being here because Ms. [S.] is nice. She gives me toys, dresses, and she does my hair. I love going to church. My mom said I can see her when we go back with mom.' [¶] In the beginning of this case the department's characterization of [Mother's] visits with the children was very good; in fact, they said visits were excellent; but subsequently there was [a] decline in the quality and nature of the visits. The Department described in subsequent reports that [Mother] spent some time unable to focus on the children during visits. She would argue with the social workers. She was unable to engage with all three children at once. [¶] [T.P. and N.P.] reported feeling not in terms of jealousy but that [Mother] spent more time with the other children and that it hurt their feelings. The children have been in therapy while in the [caregivers'] care. [¶] In the [six-month status review] report the therapist indicated in-person monthly visits she had seen [L.P.] well bonded with the caregivers . . . and reports [L.P.] is comfortable telling them what her needs and wants are. [Her] therapist reports that [L.P.] is a role model client and has [excelled] in mental health services. She enjoys meeting with her therapist once a week. [L.P.] expressed she felt happy when visiting her mom because of the fun activities they do, but she would like C.S.W. Jenkins to stay with them during visits. [¶] . . . [¶] The therapist for the children commented that working with [T.P.] has been going well but that [T.P.] is more parentified and hesitant. [¶] Mr. Davis reports he's worried that Mother was doing what she can to undermine the foster parent, which can cause disruption with the children . . . . [¶] . . . There

were several notes of [Mother] having inappropriate discussions with the kids, telling them their caregivers are the reason they cannot go home, telling them they are going home at the next court hearing. [¶] [In] the report dated July 10, 2024, the children had been in care for 14 months. [¶] [T.P.] reported, 'It is hard to tell my mom no. Sometimes I'm scared and worried. Sometimes mom gets upset, and I'm scared to tell her some things, but I am also worried that I will not go back to mom and be together'. [¶] [T.P.] reported he's happy and loves Ms. [S.] but still likes seeing his mom; that at visits he feels the most comfortable when C.S.W. Jenkins is present. [T.P.] appears well bonded with the caregivers and continues to report being safe and loved from the caregivers. [¶] [L.P.] reports, 'Sometimes it is hard to tell mom how I feel because I'm worried she'll get mad at me. Mom made us take a nap last time, and I did not like it. I don't know why she made us do that. I did not want to tell her no because I did not want to upset her.' [¶] [L.P.] tends to be closed off and reserved when discussing how she would feel if monitor C.S.W. Jenkins was not present. [L.P.] reported she likes Mr. Jenkins there because he watches them. . . . [¶] . . . [¶] At the 18 month review hearing, the November 12, 2024 report indicated that the children, during monthly visits with the social worker, have an appropriate bond with caregivers and continue to report they feel happy and safe with Mr. and Mrs. [S]. They report they enjoy church every Sunday with the caregivers as well as feeling loved and safe with the [S.'s]. [¶] [T.P.] turns into physical aggression against [N.P.] when [N.P.] refuses to participate in phone calls and visits with [Mother]. The children's therapist at that time expressed extreme concern about [T.P.'s] emotional state and asked whether it was possible not to have the children visit their

26

mother.  The therapist reported concerns with the children's emotional state as he expressed a significant shift in their behaviors. [¶] Mr. Davis [the therapist] reports [T.P.] is becoming a completely different kid, becoming more reserved.  He asked the social worker if there is a way to not have visits between mother and the children or reduce the visits. [¶] Mr. Davis reported visits were detrimental to the children at this time and stated, 'I met with [T.P.], and it is like he's a different kid.  He was not the happy, smiling kid I am used to see[ing], but I can tell something was going on because he was just cold and not present.  I have to feel [T.P.] has taken on the role as the protector of mom, and there's been a shift in his demeanor after the report of mother telling him he's not a man.' [¶] Mr. Davis reported concerns that [T.P.] during that time felt like he had failed his mother as he had not been able to control his siblings and their engagement with mom and then having mom tell him over and over that he's not the man.  Mr. Davis voiced concerns about the psychological effect Mother's involvement with them plays on the children. [¶] Mr. Davis reported there was fear that the rapport he buil[t] with [T.P.] would be eliminated if [Mother] continued to be in the picture.  Mr. Davis reported there is a continuing spiral pattern of behavior following Mother's visits. [¶] A concern was raised that [Mother] was discussing her financial situation with the children and asked [T.P.] to help her.  Money had come up missing in the caregivers' home.  [T.P.] had asked to bring money back to mom to help her.  The caregivers spoke with [T.P.] and reminded [him] he's not responsible for his mom's financial needs. [¶] [T.P. and L.P.] both described enjoying visits with [Mother], as long as the social worker is there, that they do not like it when she uses the rest room in front of them or argues

or yells at social workers. [¶] [L.P.] shared she doesn't like it when [Mother] whispers bad things in her ears. It makes her upset. . . . [¶] . . . [¶] [Mother] frequently becomes dysregulated during visits to the extent that monitors are unable to redirect them, which has led to some visits being terminated early. [¶] . . . [A]fter the 18 month review hearing on January 14, 2025, when the court terminated [Mother's] reunification services, she had a dramatic breakdown in front of the kids in the courthouse where she cried, screamed, and banged on the elevator door. [¶] [T.P.] became emotional, [L.P.] shut down, and [N.P.] immediately went to his caregiver for protection. The children have witnessed firsthand how [Mother] is affected by this case, and their testimony on May 29[, 2025] was the result of it leading up to the permanency planning hearing. [¶] [T.P.] told the social worker, . . . 'I feel like I'm a rope. I would love staying here. I just want to talk to my mom.' He said he did not want to be adopted and . . . that he would feel sad if he could not see her anymore during testimony. [¶] [L.P.] testified that mom told the children if they love her, they need to fight for her. She then stated [if] she were adopted, she would feel calm; however, when she testified, she said she doesn't want to be adopted but wants to continue living there until mom gets them back. [¶] For the first time in the life of this case, she said she feels safe with her mom, despite repeatedly telling her social workers that she wants them present when she visits her mom. [¶] . . . [¶] It is clear [the children] love their mother. They want to protect her and do not want to make her unhappy. It is clear they are safer and happier where they are, but they are conflicted about those feelings. They have seen how upset she was after the [18-month review] hearing, and they do not want to be the cause of upsetting [her] more. [¶] Given all

28

the evidence, I can't find that [Mother] has shown by preponderance of evidence that her relationship is a substantial positive emotional attachment. I can't find that terminating that attachment would be detrimental to the children when balanced against the countervailing benefit against a new adoptive home. [¶] The children will struggle with this court's decision. I know they will be sad, but I have seen from the evidence they recognize they have a healthy, stable home, and they want to stay there; so I am finding that the permanence to be achieved by adoption outweighs the attachment they have to their mom. [¶] . . . [¶] The court finds by clear and convincing evidence that the children are adoptable, and there are no legal impediments to adoption." The juvenile court went on to designate the current caregivers as the children's prospective adoptive parents.

This appeal followed.

## DISCUSSION

A.      Beneficial Parental Relationship Exception to Adoption

Mother contends the juvenile court should have applied the beneficial parental relationship exception to termination of parental rights because she proved the three elements that establish the exception. We disagree.

### 1.    *Applicable Law*

At the permanency planning hearing, if the court finds that the child is likely to be adopted and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate

29

parental rights and select another permanent plan." (*In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)

One of the exceptions, the beneficial parental relationship exception, applies when (1) "the parent has regularly visited with the child"; (2) "the child would benefit from continuing the relationship"; and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, at p. 632.)

To establish the second element, that the child would benefit from continuing the relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential

adoptive parent(s). . . . Accordingly, courts should not look to whether the parent can provide a home for the child." (*Id*. at p. 634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.)

The parent bears the burden to show the statutory exception applies. (*In re Derek W*. (1999) 73 Cal.App.4th 823, 826.) When a parent meets that burden, it would not be in the best interest of the child to terminate parental rights. In that case the court must select a permanent plan other than adoption. (*Caden C., supra*, 11 Cal.5th at pp. 636–637.)

We review the court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of review; and for the court's weighing of the relative harms and benefits of terminating parental rights, we use the abuse of discretion standard. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) However, when the party with the burden of proof did not carry the burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W*. (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B*. (2020) 9 Cal.5th 989, 1010, fn. 7.)

31

2.   *Analysis*

As set out above, the juvenile court found that Mother had failed to show by a preponderance of the evidence that the benefit of maintaining a relationship with her outweighed the benefits to T.P. and L.P. of permanency through adoption.  Put another way, Mother failed to show that it would be more harmful to each child to sever the relationship with her than to give each of them an adoptive family.  (*Caden C., supra*, 11 Cal.5th at p. 633 [would a new stable home, on balance, alleviate the emotional instability and preoccupation that may result from the loss of a parent].)

Mother does not challenge the facts that support adoption.  She simply argues they are not sufficient.  We disagree and conclude the facts do support rejecting the parental benefit exception to adoption.  The facts speak for themselves.  In summary, the children spent two full years subject to Mother's volatile and unpredictable behavior, unkind comments, and, at times, outright rejection of their presence in her life.  Their love for her belied the chronic distress she subjected them to while acting as their parent.  The evidence substantially supported the juvenile court's conclusion that there was no *positive*, emotional attachment between Mother and her children and that, as a result, the children would not benefit from maintaining their emotional relationship with her.

The juvenile court also did not abuse its discretion in finding that the balance of facts favored adoption.  Mother had 18 months of reunification services and, despite some periods of relative calm, she was as erratic and volatile at the end of the period as she was at the beginning of the case.  The juvenile court keenly observed the cycle of volatility that the children and Mother endured during the two-year life of this case.  T.P. and

32

L.P. were riding an emotional roller coaster as their Mother repeatedly lost her focus, denied her mental health issues, and ladled aggression, anger, and blame on them, the caregivers, and those providing her support services and housing. Mother's repeated inability to regulate her emotions, resulting in termination of several shelter opportunities and service programs, did not inspire trust that she could act as the lone responsible "adult in the room" with her children. It is telling that in 18 months, she had no unmonitored visitation with her children. It is more telling that the children welcomed the monitoring. The children's interactions with Mother caused them stress, fear, and discomfort. The court's decision was difficult because the children were old enough to feel conflicted, feelings the juvenile court acknowledged. Nevertheless, after 18 months of services that seemed to make no dent in Mother's unpredictable volatility and negative impact on her children, it was time for the court to give them what they needed most—a safe, secure, predictable home. The juvenile court did not abuse its discretion in doing so.

B. Indian Child Welfare Act of 1978 (ICWA)

Here DCFS sent notices to the Cherokee tribes after learning late in the game that maternal great grandfather may have Cherokee heritage. There is no record that DCFS ever filed its notices or any responses it may have received as a result of its inquiries. Nor does the record reflect whether DCFS attempted to learn whether the maternal great grandfather was available to be questioned about his ancestry. The juvenile court ultimately did not compel DCFS to complete its inquiry and it found that it had no reason to know that the children had Indian heritage.

33

Mother contends substantial evidence does not support the juvenile court's conclusion that there is no reason to know that the children may have Indian heritage. DCFS concedes the juvenile court erred in this regard. We agree and conditionally reverse so that the juvenile court can complete its ICWA review and analysis properly.

1. ***Applicable Law***

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1128–1129 (*Dezi C.*), quoting 25 U.S.C. § 1902.) Both ICWA and the Welfare and Institutions Code define an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b) [incorporating federal definitions].)

The juvenile court and DCFS are charged with "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.) The duty to inquire whether a child is an Indian child begins with the initial contact, i.e., when the referring party reports child abuse or neglect that triggers DCFS's investigation. (§ 224.2, subd. (b)(1), (2).) DCFS's initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the

34

child whether the child is, or may be, an Indian child. (*Id.*, subd. (b)(2).) Extended family members include "a person who has reached 18 years of age and who is the [child's] grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1); 25 U.S.C. § 1903(2).)

"When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) There is "reason to believe" a child involved in a proceeding is an Indian child whenever the court or social worker "has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).) Further inquiry may be conducted by, among other things, interviewing the parents and extended family members, and contacting any tribe that may reasonably be expected to have information about the child's membership, citizen status, or eligibility. (*Id.*, subd. (e)(2).)

If the inquiry establishes a "reason to know" an Indian child is involved, notice of the proceedings must be provided to the pertinent tribes. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1133; *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1079.) There is "reason to know" a child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child "is an Indian child," the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) Thereafter, the court shall confirm that DCFS used due diligence to identify

35

and work with all of the tribes of which there is reason to know the child may be a member, or eligible for membership, to verify whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership. (*Id.*, subd. (g).) A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe "shall be conclusive." (*Id.*, subd. (h).)

If, instead, the juvenile court finds no reason to know the child is an Indian child and finds "that an agency's inquiry and due diligence were 'proper and adequate,' " the court may make a finding that ICWA does not apply. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134, quoting § 224.2, subd. (i)(2).) A court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from an inquiry that is not proper, adequate, or demonstrative of due diligence. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408 (*Josiah T.*).)

## 2.    *Standard of Review*

We review the juvenile court's ICWA findings for substantial evidence. (*Josiah T.*, *supra*, 71 Cal.App.5th at p. 401; *In re S.R.* (2021) 64 Cal.App.5th 303, 312; *Dezi C.*, *supra*, 16 Cal.5th at p. 1134 ["The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' "].) If our review reveals error resulting in in inadequate initial ICWA inquiry, then we must order "conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with [California Rules of Court], rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3." (*Dezi C.*, at p. 1136.)

3.    *Analysis*

The trial court erred in not completing its inquiry into the children's possible Indian heritage. (§ 224.2, subd. (b); see *In re Y.W.* (2021) 70 Cal.App.5th 542, 555 [juvenile court has a duty "to ensure the Department adequately investigated the children's possible Indian ancestry through [Mother's] side of the family"]; *In re Rylei S.* (2022) 81 Cal.App.5th 309, 320.)  The juvenile court should have followed up with DCFS as to its efforts to ascertain whether the children had possible Cherokee heritage through Mother's side of the family.  "[T]he court has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so."  (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.)  Conditional reversal is required when error results in an inadequate ICWA inquiry.  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

We note ICWA does not require DCFS to "cast about" for investigative leads.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.)  At this point DCFS's obligation is to advise the court as to any response it received from its notice to the Cherokee tribes and the court's obligation is to act upon that advisement.

37

## DISPOSITION

The juvenile court's termination order is conditionally reversed. The matter is remanded for the limited purpose of complying with the inquiry and notice provisions of ICWA and its California implementing provisions. If the juvenile court thereafter finds a further inquiry was proper and adequate, finds due diligence has been conducted, and concludes ICWA does not apply, it shall reinstate the termination order. If the juvenile court concludes ICWA does apply, then it shall vacate the underlying order and proceed in conformity with ICWA and related California law. (25 U.S.C. § 1912(a); §§ 224.2, subd. (i)(1), 224.3 & 224.4.)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.

SCHERB, J.